# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Rajesh Singh, Ph.D.,**

    **Plaintiff,**

**v.**              **Case No. 15-cv-9369-JWL**

**Michael D. Shonrock, Ph.D.; David P. Cordle, Ph.D.;**
**Gwen Alexander, Ph.D.; Andrew J.M. Smith, Ph.D.;**
**and Emporia State University,**

    **Defendants.**

## <u>MEMORANDUM & ORDER</u>

  Plaintiff Rajesh Singh, Ph.D., was employed as an assistant professor at Emporia State University on a series of one-year probationary "term" appointments. After plaintiff served five years of a six-year probationary period, the University decided not to renew plaintiff's probationary appointment and offered plaintiff a one-year "terminal" appointment. Plaintiff accepted that offer and his employment terminated at the end of that contract term. He filed this lawsuit alleging that Emporia State University failed to renew his appointment on the basis of his race, color and/or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq.; and that the individual defendants violated his Fourteenth Amendment rights to equal protection and due process and retaliated against him for exercising his First Amendment free-speech rights. This matter is presently before the court on defendants' motion for summary judgment

on all claims (doc. 110).  As will be explained, the motion is denied as to plaintiff's First Amendment retaliation claim against defendant Cordle and is otherwise granted.[1]

## I.     Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  The process for promotion and tenure at defendant Emporia State University ("ESU") is governed by policies of the Kansas Board of Regents and ESU.  The Board of Regents policy provides that, subject to termination for cause or other circumstances, teachers and instructors should have permanent or continuous tenure after the expiration of a probationary period.  ESU policy requires that all faculty serve a probationary period of six years of full-time employment preceding the granting of tenure.  This probationary period consists of annual "term" appointments for an academic year.  ESU policy allows the University "at its discretion" to "decide not to renew an academic probationary appointment."

The annual reappointment process begins at the department level.  Pursuant to ESU policy, each department establishes a Faculty Promotion Committee (FPC) charged with making "advisory" recommendations concerning reappointment to the department chair and, ultimately, the Dean of the department.  The Dean of the department then reviews those recommendations and forwards those recommendations, along with his or her own recommendation, to the Office of the Provost.  The Provost then reviews the recommendations, along with any materials

---

[1] Defendants' motion to exclude expert testimony is also pending before the court.  The expert testimony at issue relates solely to plaintiff's discrimination claims.  Because the court grants summary judgment on plaintiff's discrimination claims, the motion to exclude is moot.

submitted by the faculty member, and makes his or her own recommendation. Those recommendations and materials are then forwarded to the Office of the President. The president makes the final decision concerning reappointment and promotion.

Any faculty member who is dissatisfied with any employment-related matters, including issues relating to reappointment, may utilize the University's grievance procedure. To initiate that process, the faculty member contacts the Faculty Affairs Committee (FAC), who provides the faculty member with the names of current ombudspersons for the purpose of attempting to resolve the problem prior to the filing of a formal grievance. The faculty member chooses one or more ombudspersons to assist them in the process. The ombudsperson(s) then meets with the grievant and the responding parties in an effort to conciliate the dispute. Once the ombudsperson notifies the FAC as to whether conciliation efforts were successful, the grievant may choose to file a formal petition by submitting that petition to the FAC. A five-person grievance committee is then selected through input from the grievant, the responding parties and the FAC. University policy permits the grievance committee to resolve the grievance on written submissions or after a grievance hearing. The decision of the grievance committee is then submitted to the University president, who is "expected" to give "significant consideration" to the recommendations of the grievance committee in rendering a final decision.

The School of Library and Information Management ("SLIM") is a department at ESU. In July 2009, plaintiff Rajesh Singh accepted his first probationary appointment as an Assistant Professor within SLIM. Plaintiff was born in India; his race is Asian; and his skin color is brown. The appointment, considered a "Fiscal Year 2010" appointment, ran from August 2009 through May 2010 with a salary of $55,000 and no credit towards tenure. In June 2010, plaintiff

accepted a probationary appointment for Fiscal Year 2011 with a salary of $55,500 and one year of credit towards tenure. At the same time, defendant Andrew Smith was offered and accepted his first probationary appointment as an Assistant Professor within SLIM at a salary of $58,000 and two years of credit towards tenure. Like defendant Smith, another new faculty member, Sheila O'Hare, was given a probationary appointment for Fiscal Year 2011 at a salary of $58,000. Defendant Smith and Ms. O'Hare are Caucasian.

In late June 2010, plaintiff sent an email to defendant Gwen Alexander, Ph.D., the dean of the SLIM department. Defendant Alexander is Caucasian. In that email, plaintiff complained that new faculty "with fewer qualifications and far fewer accomplishments" had been hired at a higher salary and with credit towards tenure. Plaintiff requested that his salary be increased and that he receive credit towards tenure in light of his academic and scholarly accomplishments. Defendant Alexander met with plaintiff about his complaints and explained the reason for the salary differential and ESU's policy regarding credit towards tenure.

The record reflects that plaintiff's relationship with defendant Alexander was, at best, strained. The record is unclear whether the relationship deteriorated as a direct result of plaintiff's complaint about faculty pay and tenure credit. Plaintiff's evidence suggests that defendant Alexander believed that plaintiff was biased against "white people," was misogynistic, and harbored a bias against older faculty members. According to plaintiff, defendant Alexander held these beliefs based on an express or implicit bias against people of color. Plaintiff has come forward with evidence that defendant Alexander discouraged students from utilizing ESU's writing center for assistance with writing deficiencies because "all they do is hire Asian people" at the writing center; that she advocated against implementing a certain

4

program because she thought it would attract only Asian students; and that she lamented the fact that only Asian people were applying for open positions at library and information management schools. Viewed in the light most favorable to plaintiff, the evidence reflects that defendant Alexander spoke to plaintiff in harsh tones and in a disrespectful manner. She complained that plaintiff often kept his office door closed shut but did not complain when Caucasian faculty members kept their doors closed. Ultimately, defendant Alexander began complaining to other faculty members that plaintiff was not collegial and she advised other faculty members not to socialize or become too friendly with him.

In December 2010, plaintiff received his first evaluation and plaintiff does not dispute that the evaluation was positive—indeed, defendant Alexander stated in the evaluation that plaintiff was "well on [his] way" to earning tenure and promotion. Plaintiff, however, believed that defendant Alexander, in the evaluation, minimized his accomplishments and inappropriately focused on collegiality and collaboration. In the evaluation, for example, defendant Alexander encouraged plaintiff "to bring forth your ideas, develop collegial relationships with senior and new faculty, and invest your time and energy in collaborative projects." Plaintiff objected to the evaluation in part because it included implications about collegiality (which he felt were inaccurate) and he believed that ESU policy did not permit assessment or evaluation on the basis of collegiality. Plaintiff complained about his evaluation to then-Provost Tes Mehring and asserted that defendant Alexander was unfair to him in light of his June 2010 complaints about pay inequity. Plaintiff filed a grievance about the evaluation but later withdrew it. In June 2011, plaintiff accepted a probationary appointment for Fiscal Year 2012 at a salary of $55,500 with two years of credit towards tenure.

Plaintiff received another FPC evaluation in December 2011. In that evaluation, the FPC recommended that plaintiff's appointment with ESU and SLIM be renewed, Writing for the committee, Ann O'Neill noted plaintiff's strengths in teaching and research and labelled as "adequate" his "service" contributions. Under "other comments," Ms. O'Neill, on behalf of the committee, noted:

> We believe that [plaintiff] could be a more active participant in SLIM functions. While he could make valuable contributions, he rarely speaks up and when he does, his comments are negative and alienating. We believe his isolation from and negativity toward other SLIM faculty do not encourage a collegial environment.

Plaintiff believes that the FPC's description was "totally incorrect" and he submitted a letter to the FPC in response to the evaluation in which he challenged that assessment, among other things. In March 2012, defendant Alexander sent a letter to plaintiff about his 2011 FPC evaluation. In that letter, she indicated that plaintiff "continued to make progress toward tenure and promotion at SLIM" but encouraged him to "give attention to the tenure and promotion committee's comment about collegiality and make every effort to engage with [his] colleagues." In June 2012, plaintiff accepted a probationary appointment for Fiscal Year 2013 at an increased salary of $58,580 with three years of credit towards tenure.

In December 2012, the FPC committee again recommended plaintiff's appointment with ESU and SLIM be renewed. Ms. O'Neill highlighted plaintiff's excellence in teaching and his "strength" in research. Nonetheless, the FPC again noted that it remained "concerned with [plaintiff's] lack of confidence in his SLIM colleagues and ESU." Plaintiff submitted a letter to the FPC in response to the evaluation in which he urged that the FPC's references to collegiality were not relevant to any promotion criteria and were not tied to any specific tenure and

promotion guidelines. In February 2013, then-Interim Dean Smith followed up with plaintiff about the FPC's evaluation. In that letter, Mr. Smith encouraged plaintiff to give attention to the FPC committee's "comments about participation, collegiality and attitude." Mr. Smith continued:

> It is imperative for the good of the institution that we keep our comments about our colleagues, programs, ESU and the Emporia community positive when addressing students and those beyond the university. Debate within our community is expected and encouraged, but if we denigrate our colleagues, the SLIM program and the university, we damage our own reputations even more than our university.[2]

In June 2013, plaintiff accepted a probationary appointment for Fiscal Year 2014 at an increased salary of $59, 283.20 with four years of credit toward tenure.

Plaintiff understood that his FPC annual review letters included concerns about collegiality. The parties dispute whether collegiality is ever an appropriate criterion for promotion decisions at ESU. Plaintiff maintains that university policy prohibits the consideration of collegiality in connection with any promotion decisions; defendants assert that collegiality is an appropriate factor to the extent that collegiality affects the work in teaching, research and service. In any event, in November 2013, the FPC faculty recommended that plaintiff's appointment with ESU and SLIM not be renewed. In its letter, the FPC stated in part as follows:

> Despite our efforts in previous review letters to encourage [plaintiff] to collaborate with faculty and to share his teaching experiences, he has consistently rejected the

---

[2] While the record is not entirely clear, it appears as though plaintiff had recently voiced his concerns about certain academic decisions within SLIM and the university as a whole that plaintiff believed would negatively impact ESU, including decisions like removing the GRE requirement for admission and lowering the bar for acceptable course evaluation ratings for purposes of promotion and tenure consideration.

> FPC's comments in previous annual review letters which were designed to offer encouragement to junior faculty as well as to make additional suggestions for professional development and growth within SLIM. We regret that this professional advice has been repeatedly rejected in writing. We also regret that there is a corresponding lack of collegiality and cooperation between [plaintiff] and the rest of the SLIM faculty and staff.

Plaintiff contends that defendant Alexander offered suggestions on what the FPC should include in the letter despite the fact that she was not an FPC member and, as the person who was required to review that recommendation, had a conflict of interest that prohibited her from participating in the drafting of the letter. Defendants assert that defendant Alexander simply responded to "procedural" questions posed to her from the committee about the contents of the letter. In any event, plaintiff submitted a rebuttal to the FPC evaluation under a cover letter dated December 16, 2013. The rebuttal addressed the FPC evaluation line by line. The FPC reviewed the rebuttal and stood by its recommendation.

In late January 2014, defendant Alexander issued a letter to plaintiff indicating that she had reviewed the evaluation and plaintiff's response and that she concurred with the FPC recommendation such that she would recommend to defendant David P. Cordle, the Provost, that plaintiff's appointment not be renewed. Plaintiff responded to defendant Alexander and submitted a copy of his response to Provost Cordle. During this same time frame, plaintiff contacted the Faculty Affairs Committee for the purpose of obtaining assistance from an ombudsperson with respect to his challenge of defendant Alexander's and the FPC's recommendations. Plaintiff selected Dr. Michael Morales from the list of available ombudspersons. He provided Dr. Morales with a binder of materials that the parties have called a "pre-grievance binder." The pre-grievance binder consists of 162 pages of materials,

including plaintiff's responses to his FPC evaluation letters; the history of his personal dispute with defendant Alexander beginning with his "pay equity" complaint in July 2010; letters of support from colleagues and students; examples in which certain members of the department interfered with plaintiff's "academic freedom"; the department's alleged improper use of collegiality as a tenure review criterion; and a detailed list of plaintiff's accomplishments as compared to the accomplishments of his colleagues within SLIM. In addition, the binder contains allegations that a "culture of bias" exists within SLIM and notes high faculty turnover rates among people of color. Dr. Morales shared this binder with defendant Cordle in late January 2014.

By letter dated February 28, 2014, Provost Cordle informed plaintiff that he decided not to renew plaintiff's probationary appointment at ESU. Significantly, plaintiff does not controvert that Provost Cordle made the non-renewal decision "based upon his own conclusion that [plaintiff] had not met expectations in the area of service." According to Provost Cordle, the primary factor in his decision was plaintiff's failure to work as a positive member of SLIM's academic team. Provost Cordle stated that the materials that plaintiff had submitted to him through Dr. Morales substantiated the concerns expressed by defendant Alexander and the FPC—that plaintiff was unwilling to accept guidance and direction and displayed a negative attitude toward his colleagues. As explained by Provost Cordle in his letter to plaintiff:

> In these materials, you focus inordinately on belittling your colleagues' accomplishments and demonstrate a tendency to reject even the most constructive criticism. Unfortunately, such a mindset does not leave much room for professional growth, nor it is predictive of your future success as an ESU faculty member.

> The collective work of the faculty in an academic unit is critically important, and the individual's contribution to that work is service in its truest sense. I am concerned that your participation in this collective work is problematic to the point of undermining the unit itself, and for that reason I conclude that your appointment should not be renewed.

Provost Cordle's deposition testimony elaborated on the points raised in his letter and he confirmed in his deposition that, while he considered the recommendations of the FPC and defendant Alexander, his decision was based primarily on the materials submitted by plaintiff which Provost Cordle believed were submitted "with the idea of making a case for his reappointment." Provost Cordle testified that he was "disturbed" by examples of plaintiff's "disdain and belittling" of his colleagues and plaintiff's "inordinate resentment of what other people have received and whether they deserve it or not."

In late March 2014, plaintiff filed a formal grievance with the FAC concerning his nonrenewal and, in April 2014, plaintiff submitted a formal complaint to Judy Anderson, ESU's executive director of human resources and affirmative action, asserting that the nonrenewal decision was based on plaintiff's race, color and national origin. During this same time frame, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission. In early June 2014, plaintiff accepted a terminal appointment for Fiscal Year 2015. Shortly thereafter, defendant Alexander issued a letter to plaintiff detailing the expectations for his terminal appointment at ESU. Essentially, all academic responsibilities were removed from plaintiff and he was instructed to vacate his office and arrange for the return of his ESU equipment, keys and access cards. Defendants then changed the lock on the door of plaintiff's office. Defendants assert that they decided to simply pay plaintiff his salary without permitting him to work because plaintiff's continued presence in the department was detrimental to the department. The

evidence reflects that these decisions were made jointly and primarily by defendant Alexander and defendant Cordle, who consulted with defendant Shonrock and ESU's general counsel.

In November 2014, the grievance committee issued an initial determination affirming the FPC's decision to recommend plaintiff's non-reappointment and Provost Cordle's confirmation of that recommendation. The committee further concluded that a formal hearing on plaintiff's grievance was not necessary. Consistent with ESU policy, plaintiff was permitted to file a response to the initial determination. In late November 2014, the grievance committee issued a final determination to defendant Michael E. Shonrock, ESU's president. The grievance committee chair also sent a copy of the final determination to plaintiff. The final determination stated that the grievance committee members individually had spent many hours reviewing over 1000 pages of evidence and unanimously decided against plaintiff. It further noted that none of the committee members had requested argument or testimony on any issues such that a hearing was not required.

In addition to issuing its final determination concerning plaintiff's nonrenewal, the grievance committee issued a separate memorandum to defendants Cordle and Shonrock (a memorandum that plaintiff calls a "secret" memorandum) that highlighted concerns the committee had based on its review of plaintiff's grievance. Those concerns included the following: that the SLIM administrative staff had engaged in offensive behavior (including the open expression of prejudice "toward various racial and ethnic groups, genders, members of various sexual orientations, and veneration of despicable individuals such as Adolph Hitler"); that was allowed to continue unchecked; that a "pervasive micro-management of faculty and staff" existed within SLIM and an undue attention to protocol that was unusual in an academic

setting; that there appeared to be a "lack of an inclusive atmosphere" within SLIM where the contributions and ideas of all faculty and staff are welcomed and respected; that the "leadership style" within SLIM was more suited for a private sector organization rather than an academic setting.

Plaintiff submitted a letter to defendant Shonrock on December 12, 2014 urging him to overrule the grievance committee's final determination and reinstate him as a professor at ESU. Defendant Shonrock concurred with the findings and recommendations of the grievance committee by letter dated January 9, 2015, thereby rendering a final decision on the termination of plaintiff's employment.

Plaintiff is currently appointed as an Assistant Professor of Library and Information Science at St. John's University in New York.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II. Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the

burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

### III.    Plaintiff's Title VII Claims against Defendant Emporia State University

Plaintiff claims that ESU's nonrenewal decision was based on plaintiff's race, color and national origin in violation of Title VII. He further asserts that ESU, again in violation of Title VII, removed all academic responsibilities from him and changed the locks on his office door in retaliation for his formal complaints of discrimination. ESU moves for summary judgment on all of plaintiff's Title VII claims. Because no reasonable jury could infer discrimination or retaliation from the facts presented, summary judgment is appropriate on these claims.[3]

*A.    Discrimination*

In the pretrial order, plaintiff contends that ESU based its nonrenewal decision on plaintiff's race, color and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. As plaintiff has no direct evidence of discrimination, his claim is analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 627 (10th

---

[3] Defendant asserts that the court lacks subject matter jurisdiction over plaintiff's KAAD claims because plaintiff failed to exhaust his administrative remedies with respect to those claims. Because plaintiff's KAAD claims would not survive summary judgment in any event, the court declines to address this issue. *Nyanjom v. Hawker Beechcraft Corp*., 641 Fed. Appx. 795, 800 (10th Cir. Jan. 28, 2016) (same standards and burdens apply to claims under Title VII and the KAAD).

Cir. 2012). Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*. To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id*. (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If he establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If defendant meets this burden, summary judgment against plaintiff is warranted unless he introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

1.      Plaintiff's Prima Facie Case

In its motion for summary judgment, ESU contends that the only adverse actions properly challenged by plaintiff are defendant Cordle's decision not to renew plaintiff's appointment and defendant Shonrock's January 2015 final decision confirming the findings of the grievance committee. In response, plaintiff asserts that the nonrenewal of his appointment "occurred between November 2013 (initial recommendation from FPC) and February 28, 2014 (Dr. Cordle's formal decision)." For purposes of plaintiff's discriminatory nonrenewal claim, however, plaintiff did not suffer an adverse employment action until defendant Cordle's decision in February 2014 and, arguably, defendant Shonrock's final decision in January 2015. The recommendations of the FPC committee and defendant Alexander, then, do not constitute

adverse employment actions.  *See Macon v. United Parcel Service, Inc*., 743 F.3d 708, 715 (10th

Cir. 2014) (when supervisor's ability to make employment-related decisions is contingent on the

independent affirmation of a higher-level manager or review committee, proper focus is on the

final decisionmaker); *Couch v. Board of Trustees of Memorial Hosp. of Carbon Cty*., 587 F.3d

1223, 1242 (10th Cir. 2009) (committee recommendations to higher authority do not constitute

adverse employment actions).[4]

ESU further asserts that plaintiff cannot establish a prima facie case of discrimination

because he cannot show that the reappointment or nonrenewal decision took place under

circumstances giving rise to an inference of discrimination. In support of this argument,

however, defendant essentially relies on its asserted reasons for declining to renew plaintiff's

appointment and plaintiff's lack of pretext evidence.  Stated another way, ESU suggests that

plaintiff must disprove ESU's proffered reasons for the employment decision in order to

establish his prima facie case.  This argument constitutes an impermissible "end run" around the

*McDonnell Douglas* analysis and the court cannot consider it at the prima facie stage. *See, e.g.,*

*EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1192–94 (10th Cir. 2000) (requiring

plaintiff to disprove defendant's proffered reason for employment decision to establish prima

facie case would inappropriately short circuit *McDonnell Douglas* analysis and frustrate

plaintiff's ability to establish pretext).

---

[4] The court is not suggesting that the recommendations of the FPC and defendant Alexander are
not pertinent to plaintiff's claim.  In fact, the court will examine plaintiff's evidence concerning
these allegedly biased recommendations in the context of assessing whether those
recommendations proximately caused the final decision.  But for purposes of assessing
plaintiff's claim for relief, the proper adverse action is the final decision itself rather than any
intermediate steps leading to that final decision.

Moreover, to raise an inference of discrimination at the prima facie stage in a discriminatory discharge case, a plaintiff's burden is not onerous—he need only show that he belongs to a protected class; that he was qualified for his job; and that the job was not eliminated after his discharge. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *see also Nguyen v. Gambro BCT, Inc.*, 242 Fed. Appx. 483, 487-89 (10th Cir. 2007) (prima facie step is utilized to eliminate the two most common explanations for termination—lack of qualification or the elimination of the position). The court concludes that plaintiff has sufficiently raised an inference of discrimination for purposes of his prima facie case.

2.      The Pretext Analysis

Because the court concludes that plaintiff has satisfied his burden of establishing a prima facie case of discrimination, the court turns to whether ESU has met its burden to articulate a legitimate, nondiscriminatory reason for the nonrenewal decision. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that ESU has carried it here. *See id*. According to ESU, plaintiff's appointment was not renewed in light of plaintiff's failure to work as a positive member of SLIM's academic team. The burden of proof, then, shifts back to plaintiff to show that ESU's proffered reason is pretextual.

Here, plaintiff relies on two separate theories to establish pretext. First, he contends that defendant Alexander (and, to a lesser extent, defendant Smith) harbored a discriminatory bias against him and impermissibly influenced the decision-making process such that defendant Cordle was merely a "dupe" in a deliberate scheme to bring about plaintiff's nonrenewal. This is commonly referred to as a claim of "cat's paw" or "subordinate bias" liability. Second, he contends that ESU's asserted reason is simply unworthy of belief under a classic pretext analysis. As will be explained, plaintiff has failed to demonstrate the existence of factual disputes concerning the requisite causal relationship between defendant Alexander's recommendation and defendant Cordle's decision for purposes of establishing his subordinate bias theory. Moreover, plaintiff has failed to come forward with evidence from which a reasonable jury could conclude that ESU's stated reason for the nonrenewal decision is unworthy of belief. Summary judgment, then, is granted in favor of ESU on this claim.

a.      *Subordinate Bias Theory*

In his submissions, plaintiff asserts that defendant Alexander harbors a bias against Asians and acted on that bias when she aggressively sought to "get rid of" plaintiff. Plaintiff asserts that he was ostracized by defendant Alexander (and, at her direction, by other SLIM faculty members) and then was blamed for his purported lack of collegiality. He asserts that defendant Alexander's bias caused defendant Alexander to recommend nonrenewal and that defendant Cordle acted on that recommendation in rendering his decision. According to plaintiff, then, defendant Alexander's discriminatory animus infected defendant Cordle's nonrenewal decision. To be clear, plaintiff does not contend that defendant Cordle harbored any

discriminatory animus toward plaintiff and the record is devoid of any evidence suggesting otherwise.

Under a "subordinate bias," or "cat's paw," theory of recovery, an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action. *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). To survive summary judgment when a discrimination claim is based on a subordinate bias theory, the plaintiff must establish that there is a genuine issue of material fact as to (1) the discrimination animus of the subordinate, and (2) a causal relationship between the subordinate's actions and the employment decision. *See id*. at 515 (citations omitted). In order to demonstrate the requisite causal relationship, a "plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process." *E.E.O.C. v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 487 (10th Cir. 2006).

Plaintiff has come forward with sufficient evidence of bias on the part of defendant Alexander to satisfy the first prong of the test, as a reasonable jury could conclude that defendant Alexander acted with discriminatory intent when she recommended nonrenewal. Nonetheless, as to the second element, there is no evidence of a causal relationship between defendant Alexander's recommendation and defendant Cordle's decision with the result that plaintiff cannot survive summary judgment. Indeed, the record evidence demonstrates that defendant Cordle insulated himself and ESU from defendant Alexander's bias by conducting an independent investigation into the issue of whether plaintiff should be reappointed. Defendant Cordle testified at some length about the concerns that he had about plaintiff's continued

employment based on the materials submitted by plaintiff through Dr. Morales. Those materials revealed that plaintiff was unwilling to accept guidance and direction and displayed an inordinate amount of resentment toward his colleagues for their accomplishments. The evidence further reflects that defendant Cordle, rather than simply adopting the recommendation of defendant Alexander and the FPC, actually rejected certain findings made by them—including their criticisms of plaintiff's research and teaching. Defendant Cordle's letter to plaintiff, for example, expressly indicated that defendant Alexander's and the FPC's "concerns about your research are not a factor in my decision, as I believe that you are making progress toward the establishment of a viable scholarly agenda."

Plaintiff suggests that factual issues exist concerning the independence of defendant Cordle's decision because defendant Cordle refused to investigate concerns raised by plaintiff in the pre-grievance binder that a "climate of bias" existed within SLIM against people of color. But the evidence does not support the conclusion that defendant Cordle refused to investigate those concerns. Rather, as Dr. Morales testified, defendant Cordle stated that there was not time to investigate "broader" issues concerning faculty turnover and the appearance of bias within SLIM in the context of plaintiff's grievance over his particular nonrenewal decision. Dr. Morales testified that defendant Cordle agreed that the issue needed to be investigated but that, based on time constraints, defendant Cordle was focusing solely on plaintiff's nonrenewal. And with respect to that decision, there is no evidence that defendant Cordle's investigation was not independent of defendant Alexander's recommendation. *See Bird v. Regents of New Mexico State Univ.*, 619 Fed. Appx. 733, 756-57 (10th Cir. Aug. 6, 2015) (affirming grant of summary judgment on subordinate bias theory where plaintiff had no evidence that dean of department's

19

nonrenewal recommendation sufficiently influenced Provost's final decision); *Frederick v. Metropolitan State University of Denver Board of Trustees*, 535 Fed. Appx. 713, 719 (10th Cir. Oct. 3, 2013) (affirming grant of summary judgment on subordinate bias theory where plaintiff came forward with evidence that dean of department was biased in non-promotion recommendation but president of university independently reviewed the application and made his own assessment regarding the merit of the application). Finally, the court notes that defendant Cordle's decision itself was independently reviewed by the grievance committee. Plaintiff does not contend that the grievance committee was biased or merely rubber-stamped defendant Cordle's decision. He does not dispute that the grievance committee members reviewed over 1000 pages of documents in rendering its decision. That review process further insulates ESU from liability for defendant Alexander's recommendation. *See Macon v. United Parcel Serv.*, 743 F.3d 708, 715 (10th Cir. 2014) (even though supervisor with retaliatory bias started the process leading to plaintiff's termination, grievance panel independently assessed alleged misconduct and agreed upon termination and that review process appropriately constrained any improper motive on the part of supervisor).

b.      The Veracity of ESU's Stated Reason for the Nonrenewal Decision

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011) (quoting *Kendrick v. Penske Transp. Servs.,*

*Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).  In determining whether the proffered reason is pretextual, the court examines "the facts as they appear to the person making the decision, not as they appear to the plaintiff." *Id.* (emphasis in original).  The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.*

In support of his pretext argument, plaintiff directs the court to evidence that defendant Alexander assisted in drafting the FPC recommendation despite the fact that she had a conflict of interest based on her role in reviewing that recommendation; that the FPC criticized plaintiff's LI 810 course and then relied on what plaintiff refers to as "student artifacts" from that course to defend SLIM's accreditation; that ESU decided not to provide Ms. Anderson with a copy of the grievance committee's "secret memo" concerning the environment within SLIM; and that defendant Smith, a similarly situated Caucasian professor, received early tenure and promotion.  None of the evidence set forth by plaintiff casts doubt on ESU's decision. Defendant Alexander's involvement in the FPC recommendation and the FPC's criticism of the LI 810 course had no bearing on defendant Cordle's decision.  He expressly rejected the FPC's findings about plaintiff's teaching deficiencies and it is uncontroverted that he independently

assessed plaintiff's qualifications for renewal without reliance on the FPC's or defendant Alexander's recommendations. With respect to the decision not to provide a copy of the grievance committee's "secret memo" to Ms. Anderson, plaintiff fails to explain how this fact casts doubt on defendant Cordle's decision—which was made months before the memo was authored. Moreover, nothing in the memo suggests that plaintiff's nonrenewal was based on a discriminatory animus or other unlawful grounds. In fact, the memo does not mention plaintiff or the nonrenewal decision.

Finally, plaintiff has not shown that defendant Smith was "similarly situated" to him for purposes of comparing tenure and promotion decisions. He dedicates only one sentence of his brief to this "argument" and has failed to marshal any evidence to demonstrate the similarities between defendant Smith and himself for purposes of tenure and promotion. And the evidence that the court has reviewed in connection with other aspects of defendants' motion and plaintiff's responses thereto reveals that substantive and significant differences existed between these two candidates such that the promotion of defendant Smith does not support an inference of discrimination with respect to the nonrenewal of plaintiff. But perhaps most significantly, there is no evidence in the record that defendant Cordle, in rendering his nonrenewal decision, compared plaintiff's achievements or record against defendant Smith's achievements or record. In short, plaintiff has failed to establish that ESU's reason for its decision is unworthy of belief. Summary judgment is granted on this claim.

B.      Retaliation

In the pretrial order, plaintiff asserts that ESU, in early June 2014, removed all academic responsibilities from plaintiff and changed the locks on his office in retaliation for plaintiff's filing a formal complaint of discrimination with ESU and the KHRC in April 2014. To establish a prima facie case of retaliation, plaintiff must show that he engaged in protected opposition to discrimination; that defendant took an adverse employment action against him which a reasonable person would have found materially adverse; and that a causal connection exists between the protected activity and the materially adverse action. *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017).

In its motion for summary judgment, defendant concedes that plaintiff has established the first element of his prima facie case but contends that summary judgment is nonetheless appropriate because plaintiff cannot establish a materially adverse action or the existence of a causal connection between his protected activity and any adverse actions taken by ESU. Summary judgment is warranted on both grounds. Without citation to pertinent authority, plaintiff summarily contends that he suffered materially adverse actions when ESU, during plaintiff's terminal-year contract, removed all academic responsibilities from him and changed the locks on his office door. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006) (An employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."). Plaintiff does not dispute that he was paid his full salary through the end of his contract. Essentially, then, plaintiff was placed on paid administrative leave for the duration of his terminal-year contract.

The court has found no authority suggesting that the actions taken by ESU would dissuade a reasonable employee (particularly one who was already on a terminal-year contract) from making a charge of discrimination. Moreover, courts have found that such actions, as a matter of law, are not materially adverse. *See Benavides v. City of Oklahoma City*, 508 Fed. Appx. 720, 726 (10th Cir. Jan. 23, 2013) (plaintiff did not suffer materially adverse action under *Burlington Northern* by being placed on paid administrative leave during which he was prohibited from engaging in work-related activities); *Stewart v. Miss. Transp. Com'n*, 586 F.3d 321, 332 (5th Cir. 2009) (changing locks on office door does not meet materiality standard). Because plaintiff has not demonstrated that he suffered a materially adverse action for purposes of his retaliation claim, the court grants summary judgment in favor of ESU on this claim.

Summary judgment is also appropriate because plaintiff cannot establish a causal connection between his protected activity and the decision to remove all academic responsibilities and change the locks on his office. There is no evidence showing that the decisionmakers had any knowledge that plaintiff had filed a complaint with ESU or the KHRC. Plaintiff does not address this deficiency in his response. He simply urges that the temporal proximity between his complaints and the challenged actions is sufficient to establish a causal connection. But as a prerequisite to establishing a causal connection, plaintiff must first present evidence that the decisionmakers were aware of the plaintiff's protected activity at the time of the challenged decision. *See Hinds v. Sprint/United Management Corp.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (to establish causal connection, plaintiff must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity); *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182,

1188-89 (10th Cir. 2002) (same) (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker knew of plaintiff's protected activity at time discharge decision was made); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998) (same).

Plaintiff directs the court to no evidence suggesting that defendants Alexander or Cordle—the primary individuals involved in the decision to remove plaintiff's academic responsibilities and to change the locks on plaintiff's office—had any knowledge that plaintiff had filed a formal complaint with Ms. Anderson or the KHRC. To the extent that defendants Alexander and Cordle consulted with defendant Shonrock about removing plaintiff's academic responsibilities and changing his office locks, there is no evidence that defendant Shonrock had any knowledge that plaintiff had filed a formal complaint with Ms. Anderson or the KHRC at the time he would have been consulted. While there is some evidence that Ms. Anderson consulted with ESU's general counsel about the fact that plaintiff had filed a formal complaint, plaintiff offers no evidence as to the timing of any discussions between Ms. Anderson and the general counsel and, in any event, plaintiff sets forth no argument suggesting that the court should impute any knowledge on the part of ESU's general counsel to any of the key decisionmakers.[5] On this record, no reasonable jury could conclude that the key decisionmakers were aware of plaintiff's protected activities and, thus, no reasonable jury could conclude that

_____

[5] To the extent that ESU's general counsel was consulted with respect to the decision to remove plaintiff's academic responsibilities and change the locks on his office, and assuming that ESU's general counsel at the time of the consultation had knowledge of plaintiff's formal complaint, there is no evidence in the record that ESU's general counsel was motivated by any retaliatory animus when he consulted with defendants Alexander and Cordle with respect to their decisions.

defendants' actions were motivated by plaintiff's protected activities. *See Davis v. Unified School Dist. 500*, 750 F.3d 1168, 1172–73 (10th Cir.2014) (summary judgment appropriate on retaliation claim where plaintiff failed to come forward with evidence that decision maker had knowledge of protected activity). Summary judgment in favor of ESU is granted on plaintiff's retaliation claim.[6]

## IV. Section 1983 Claims[7]

Plaintiff asserts claims under 42 U.S.C. § 1983 against each of the individual defendants asserting that they violated his Fourteenth Amendment rights to equal protection and due process; and retaliated against him for exercising his First Amendment free-speech rights. The individual defendants assert that they are entitled to summary judgment on these claims based on qualified immunity. Qualified immunity "protects 'all but the plainly incompetent or those

---

[6] In the binder of materials that plaintiff, through Dr. Morales, submitted to Dr. Cordle in January 2014, plaintiff set forth a complaint that "discrimination," among other things, had factored into the FPC's nonrenewal recommendation. The court has carefully reviewed the pretrial order and plaintiff's submissions to confirm that plaintiff is not asserting that he engaged in protected activity when he submitted the binder for Mr. Cordle's review. While plaintiff mentions the binder in the pretrial order, he does so only to highlight that Dr. Cordle refused to investigate plaintiff's allegations concerning a "climate of bias" within SLIM. The pretrial order's retaliation allegations are limited to the actions taken after plaintiff's filing of his EEO complaint with ESU and the KHRC. Similarly, plaintiff asserts in his submissions only that he "engaged in protected activities by reporting discrimination to ESU and the KHRC in April 2014." The court's analysis of plaintiff's retaliation claims, then, is strictly limited to the specific claims asserted by plaintiff in the pretrial order and his submissions.

[7] In the pretrial order, plaintiff asserts that his equal protection claims and First Amendment claims are brought under both § 1983 and § 1981. Defendants move for summary judgment to the extent these claims are asserted under § 1981 and plaintiff concedes that his claims cannot be asserted under § 1981. Defendants' motion in this respect, then, is granted as unopposed. *See Bolden v. City of Topeka*, 441 F.3d 1129, 1134-37 (10th Cir. 2006) (§ 1983 provides the exclusive remedy for pursuing damages against a state actor for claims arising under § 1981).

who knowingly violate the law.'" *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010). When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).

A.     *Equal Protection Claim*

In the pretrial order, plaintiff brings a claim under 42 U.S.C. § 1983 against the individual defendants for violating the Equal Protection Clause of the Fourteenth Amendment. In his submissions, plaintiff does not separately address his equal protection claims—he simply incorporates by reference his arguments relating to his Title VII claim. But while the *McDonnell Douglas* framework can also be used to prove intentional discrimination under § 1983, *see Bird v. West Valley City*, 832 F.3d 1188, 1208 (10th Cir. 2016), plaintiff's reliance on *McDonnell Douglas* fails under § 1983 for the same reason it failed under Title VII—plaintiff cannot establish that he was a victim of intentional discrimination in connection with the nonrenewal decision because defendant Cordle and the grievance committee independently investigated defendant Alexander's recommendation and plaintiff makes no suggestion that any of the final decisionmakers were motivated by discriminatory animus. It necessarily follows, then, that plaintiff has no underlying constitutional violation on which he can rely to impose liability against any of the defendants. *See Bird,* 832 F.3d at 1209; *Jennings v. City of Stillwater*, 383 F.3d 1199, 1212 (10th Cir. 2004) ("A plaintiff may not base an equal protection

challenge [on] intermediate steps in a decisionmaking process where the ultimate result was not discriminatory.").  Stated another way, even assuming that defendants Alexander or Smith bore a discriminatory animus toward plaintiff that factored into their nonrenewal recommendations, those recommendations represented "but one link in the chain of events" that led to the ultimate nonrenewal decision—a decision made by individuals who, on the record before the court, bore no animus toward plaintiff.  *See Jennings*, 383 F.3d at 1212 (affirming grant of summary judgment on equal protection claim where plaintiff demonstrated, at most, that certain steps "in a process leading toward a final decision" were discriminatory but not that the final decision was discriminatory).  On these facts, plaintiff cannot establish an equal protection violation and, accordingly, each of the individual defendants are entitled to qualified immunity on plaintiff's equal protection claim.

B.      *Due Process Claims*

Plaintiff asserts in the pretrial order that defendants Shonrock, Cordle, Alexander and Smith violated his procedural and substantive due process rights in connection with the nonrenewal of his probationary appointment.  To prove either a procedural or substantive due-process claim, plaintiff must first prove that defendants' actions deprived him of a protected property interest.  *Haik v. Salt Lake City  Corp*., 567 Fed. Appx. 621, 628 (10th Cir. June 5, 2014) (citing *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 & n.2 (10th Cir. 2000)).[8]  The individual defendants move for summary judgment on these claims on the grounds

---

[8] Plaintiff does not suggest that his due process claims are based on a liberty interest in his continued employment with ESU.

that plaintiff cannot establish that he possessed a protected property interest in his continued employment. The court agrees that summary judgment is appropriate for this reason.

To demonstrate a property interest in employment, an employee must have a "legitimate expectation in continued employment." *Hesse v. Town of Jackson*, 541 F.3d 1240, 1245 (10th Cir. 2008) (internal quotation marks omitted). In determining whether such a property interest exists, the court looks to state law. *Maranville v. Utah Valley Univ*., 568 Fed. Appx. 571, 574 (10th Cir. 2014). In Kansas, public employment is presumptively at-will. *Washington v. Unified Gov't of Wyandotte County*, 847 F.3d 1192, 1201 (10th Cir. 2017). To alter that arrangement, an employee must demonstrate a formal guarantee of continuing employment under state law (academic tenure is a classic example), *see Maranville*, 568 Fed. Appx. at 576, or a contract or policy expressly fixing the duration of employment or otherwise limiting the employer's ability to discharge the employee. *Robert v. Board of County Commr's of Brown County*, 691 F.3d 1211, 1220 (10th Cir. 2012).

There is no dispute that plaintiff was not tenured. Although he was on a tenure track, his annual contracts with ESU contain no promise, explicit or implicit, that he could expect continued employment beyond each probationary appointment. Those contracts made no provision for renewal whatsoever and provided that plaintiff's appointment was for a finite period of time defined by the given academic year. Each appointment contract executed by plaintiff (except for his terminal contract which clearly stated that it carried no expectation of continuing employment) stated that the appointment was "subject to annual review and may, in accordance with the regulations of the Board of Regents and of Emporia State University, lead to review for tenure." ESU policy, in turn, expressly allows the University "at its discretion" to

"decide not to renew an academic probationary appointment." These contracts, then, are consistent with the general rule that non-tenured professors do not possess a property interest in continued employment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (non-tenured assistant professor had no property interest in continued employment where appointment secured no interest in reemployment for the next year and no state law or university policy secured that interest or created any legitimate claim to it); *Maranville*, 568 Fed. Appx. at 575 (applying Utah law); *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990 (10th Cir. 1996) (untenured professors in Oklahoma do not possess a legitimate claim of entitlement to their reappointment absent a specific contractual guarantee to that effect); *Cuenca v. University of Kansas*, 265 F. Supp. 2d 1191, 1215 (D. Kan. 2003) (citing *Meiners v. University of Kansas*, 239 F. Supp. 2d 1175, 1198 (D. Kan. 2002)).

Nonetheless, plaintiff urges, with citation to one case, that non-tenured professors in Kansas possess a legitimate expectation in continued employment. That case, *Wertz v. Southern Cloud Unified Sch. Dist. No. 334*, 218 Kan. 25 (1975), does not support plaintiff's assertion. In *Wertz*, the plaintiff-teacher was dismissed without pay during the term of his contract and the Kansas Supreme Court recognized that the plaintiff had a protected interest in continued employment until the expiration of the contract term. Unlike the plaintiff in *Wertz*, plaintiff here was not dismissed without pay during the term of his contract.[9] Plaintiff also contends that SLIM's policies and procedures for faculty recognition—what plaintiff refers to as SLIM's "T&P document"—sets forth certain procedures for renewal and imposes restrictions on

---

[9] While plaintiff was relieved of his job duties during his terminal appointment, he does not assert that he had a protected property interest in continuing to perform his job duties during his terminal appointment.

nonrenewal such that the document limits ESU's ability to terminate his employment. Yet he directs the court to no provisions within that 20-page document that purportedly provide a legitimate expectation of continued employment beyond the annual term provided in each annual contract. To the extent he is referring to certain procedural steps designated by SLIM concerning reappointment decisions, he is clearly prohibited from relying on procedural "timber" to "construct a property interest." *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990–91 (10th Cir. 1996) ("'Property' cannot be defined by the procedures provided for its deprivation."). To the extent he is suggesting that the T&P document requires that reappointment decisions must be based solely on a faculty member's research, teaching and service (and that his reappointment decision was not limited to these considerations), the document does not limit the University's discretion in terms of reappointment decisions and does not require that reappointment decisions be based exclusively on research, teaching and service. In short, nothing in the T&P document can reasonably be construed to provide plaintiff a legitimate expectation in continued employment at ESU.

Because plaintiff has not directed the court to any evidence in the record showing that he possessed a property right to his continued employment, under state law or some internal University policy, the court cannot conclude any property right existed. In the absence of a protected property right, plaintiff cannot establish a constitutional violation and the individual defendants are entitled to qualified immunity on these claims.

C.    *First Amendment Retaliation Claims*

Lastly, plaintiff asserts a claim under § 1983 against the individual defendants for a violation of plaintiff's First Amendment free speech rights. Although the nature of this claim is not clear in the pretrial order, plaintiff asserts in his submissions that the individual defendants, in retaliation for plaintiff's raising concerns about discrimination in his April 2014 EEO complaint to ESU's human resources department, removed all academic responsibilities from plaintiff and locked him out of his office in early June 2014. Plaintiff also asserts that Dr. Cordle, in retaliation for plaintiff's raising concerns about discrimination in the binder of materials submitted to him via Dr. Morales in January 2014, removed all academic responsibilities from plaintiff; locked him out of his office; and made the decision not to renew plaintiff's appointment. Defendants move for summary judgment on these claims.

Summary judgment is clearly warranted in favor of the individual defendants to the extent plaintiff's claim is based on his EEO complaint because no evidence exists from which a jury could conclude that any of the individual defendants had knowledge of that complaint at the time defendants decided to change the locks on plaintiff's office and remove all academic responsibilities from plaintiff in early June 2014. No reasonable jury, then, could conclude that the individual defendants took any action in early June 2014 based on any speech contained in plaintiff's April 2014 EEO complaint. *See Duvall v. Putnam City Sch. Dist.*, 530 Fed. Appx. 804, 815-16 (10th Cir. Aug. 5, 2013) (district court properly granted summary judgment on plaintiff's First Amendment retaliation claim where the record contained no evidence establishing that the defendants knew of the content of any protected communications such that plaintiff's statements could not have been a motivating factor in any adverse employment action); *Hook v. Regents of Univ. of Cal.*, 394 Fed. Appx. 522, 539 (10th Cir. Sept. 13, 2010)

("Axiomatic to establishing causation in [the First Amendment retaliation context] is proof that the employer knew of the employee's protected conduct.").  Because plaintiff cannot establish a constitutional violation with respect to his EEO complaint, the individual defendants are entitled to qualified immunity on this claim.

The court is left, then, with plaintiff's claim that defendant Cordle retaliated against him based on the speech contained in plaintiff's pre-grievance binder.  Because the only adverse action taken by defendant Cordle is the non-renewal decision, plaintiff's claim is necessarily limited to that adverse act and summary judgment is granted to the extent plaintiff challenges defendant Cordle's June 2014 decision to remove plaintiff's academic responsibilities and to change the locks on plaintiff's office door.  *See Hook v. Regents of Univ. of California*, 394 Fed. Appx. 522, 535 (10th Cir. 2010) (test as to whether an employment action is adverse in the First Amendment retaliation setting is identical to the test which is applied in Title VII retaliation claims).  Plaintiff's claim is governed by the familiar *Garcetti/Pickering* test, which consists of five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Halget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017) (citations omitted).  The first three steps concern questions of law for the court, and the last two concern questions of fact.  *Id*.

With respect to this claim, defendant Cordle contends that he is entitled to qualified immunity because plaintiff cannot establish a constitutional violation—namely, he cannot establish that the binder contained protected speech or that the speech contained therein was a motivating factor in defendant Cordle's non-renewal decision.[10] He further asserts that he is entitled to qualified immunity because it is not clearly established that plaintiff's speech was protected by the First Amendment. The court rejects these arguments and concludes that a trial is required on plaintiff's claim that defendant Cordle's non-renewal decision was motivated by plaintiff's protected speech.

1.  Constitutional Violation

Defendant Cordle asserts that plaintiff cannot establish a constitutional violation because the binder did not contain protected speech and, in any event, the speech was not a motivating factor in any of defendant Cordle's decisions. The court begins with defendant Cordle's argument that plaintiff's speech was made pursuant to his official duties such that it is not protected from regulation. *See Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006). This argument is not vigorously pressed by defendant Cordle and it is clear that plaintiff's speech concerning discriminatory bias within SLIM was not made pursuant to his official duties. There is no evidence that plaintiff had any supervisory authority within SLIM or the University such that he had a duty to report the concerns he raised or the criticisms he asserted against SLIM. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1204-05 (10th Cir.

---

[10] Defendant Cordle does not argue in his motion that the University's interests outweighed plaintiff's free speech interests or that it would have reached the same decision in the absence of the protected conduct.

2007) (teachers who criticized school principal and board were not speaking pursuant to official duties but as citizens).

Defendant Cordle next contends that plaintiff's pre-grievance binder did not address matters of public concern. In advancing that argument, defendant Cordle urges that the vast majority of speech contained in the pre-grievance binder related to plaintiff's personal dispute with defendant Alexander, his efforts to obtain reappointment, and other matters of personal significance solely to plaintiff. Defendant Cordle further asserts that plaintiff's motivation in submitting the binder was clearly for his own personal advantage rather than to vindicate the public's interest. But while most of the topics in the binder do not touch on matters of public concern, plaintiff's statements regarding a culture of discriminatory bias within SLIM and his allegations that the department chair routinely discriminated against not only plaintiff but all faculty members of color clearly touch upon matters of public concern. Indeed, both Dr. Morales and defendant Cordle acknowledged that plaintiff's allegations, on their face, revealed a serious issue that merited an investigation. The court, then, rejects defendant Cordle's suggestion that plaintiff raised concerns about discrimination for the sole purpose of retaining his job. *Compare Baca v. Sklar*, 398 F.3d 1210, 1218-19 (10th Cir. 2005) (public employee's complaints of discrimination did not merit First Amendment protection where court found that complaints were raised solely for personal reasons in an effort to undermine supervisor's accusations against plaintiff) *with Connick*, 461 U.S. at 148 n.8 (dismissed teacher's right to protect racial discrimination is "inherently of public concern" and is not forfeited by teacher's choice of a private forum) (citing *Givhan v. Western Line Consolidated Sch. District*, 439 U.S. 410 (1979)). This is sufficient to pass the second step of the *Garcetti/Pickering* analysis. *See*

*Connick v. Myers*, 461 U.S. 138, 149 (1983) (where only one question on multi-question questionnaire distributed by employee touched on matter of public concern, Court continued *Pickering* analysis).[11]

Finally, the evidence is sufficient to permit a reasonable jury to infer that defendant Cordle was motivated, at least in part, by plaintiff's protected speech when he recommended non-renewal of plaintiff's appointment. Plaintiff's evidence demonstrates that Dr. Morales advised defendant Cordle that the materials in the pre-grievance binder gave the "appearance of bias against people of color" within SLIM; that defendant Cordle agreed that the materials, at "face value," gave that appearance; that Dr. Morales strongly suggested to defendant Cordle that he investigate plaintiff's allegations; that defendant Cordle declined to investigate that "bigger issue" in light of time constraints; and that defendant Cordle admittedly made his non-renewal decision based on his review of the materials in the binder. In light of those facts, a jury could reasonably conclude that plaintiff's speech about the culture of discriminatory bias within SLIM motivated defendant Cordle, who did not want to deal with those allegations at that time, to non-renew plaintiff's appointment. This issue requires resolution at trial.

2. Clearly Established Law

---

[11] The fact that the majority of the materials in the binder concern matters of significance only to plaintiff would be pertinent at the third step of the *Pickering* analysis. *See Johnsen v. Independent Sch. Dist. No. 3 of Tulsa County*, 891 F.2d 1485, 1492-93 (10th Cir. 1989) (when a single instance of speech covers multiple topics, the *Pickering* balancing test is applied to the speech as a whole rather than to only those issues relating to a matter of public concern). But defendant Cordle does not move for summary judgment on that basis.

Because genuine issues of fact exist as to whether defendant Cordle violated plaintiff's First Amendment rights, the court turns to the second prong of the qualified immunity analysis and inquires whether the law at the time of the incident was "sufficiently clear that a reasonable official would have understood that his conduct violated the right." *See Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016). Of course, the law was clearly established at the time of defendant Cordle's decisions that a public employer could not terminate an employee in retaliation for the employee's protected First Amendment activities. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1187 (10th Cir. 2010). The relevant inquiry, then, is whether the protected nature of plaintiff's speech was "sufficiently clear" that defendant Cordle "should have been reasonably on notice" that he was not entitled to regulate it. *See id*. Without elaboration, defendant Cordle asserts that "it is not clearly established that *Garcetti* or *Connick-Pickering* applies to plaintiff's 'speech.'" The single case cited by defendant Cordle in support of that sentence is *Klaassen v. University of Kansas School of Medicine*, 84 F. Supp. 3d 1228, 1251-52 (D. Kan. 2015). That case held only that statements made by a university professor in an academic setting concerning the medical center's financial situation and the misappropriation of grant money were made pursuant to the professor's "official duties." The professor in that case, however, had an active interest in ensuring proper grant administration because he had supervisory authority over several grants. Plaintiff's allegations of department-wide racial discrimination at a public university are substantively different than the statements examined in *Klaassen* and clearly not within plaintiff's official duties. Defendant Cordle does not contend that clearly established precedent would not have put defendant Cordle on notice that plaintiff's allegations of racial bias within SLIM, a department at a public university, were

protected by the First Amendment.  Given the specific facts in this case, that argument is untenable in any event.  *Connick*, 461 U.S. at 148 n.8 (dismissed teacher's right to protect racial discrimination is "inherently of public concern") (citing *Givhan v. Western Line Consolidated Sch. District*, 439 U.S. 410 (1979)).  The court, then, concludes that defendant Cordle is not entitled to qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 110) is **denied as to plaintiff's First Amendment retaliation claim against defendant Cordle and is otherwise granted** and defendants' motion to exclude expert testimony (doc. 113) is **moot**.

**IT IS SO ORDERED.**

Dated this 12th day of October, 2017, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge